UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ELLSWORTH CORP., ET AL., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civ. No. L-06-118 |
| | * | |
| K-F ENVIRONMENTAL | * | |
| TECHNOLOGIES, ET AL., | * | |
| | * | |
| Defendants. | * | |

## **MEMORANDUM**

Ellsworth Corporation and Travelers Indemnity Company filed the instant suit to recover unpaid premiums on a performance bond. The defendants include the company whose performance was bonded, K-F Environmental Technologies ("K-F"), and several individuals and entities that guaranteed payment of the premiums as well as any collection costs.[1]

The dispositive issue is whether the bond automatically covered all option years of a multi-year contract between K-F and the District of Columbia Water and Sewer Authority ("DC WASA"). To settle this issue, the Court held a bench trial on June 4, 5, 6, and 26, 2007.[2] The Court finds that the bond covered all option years and could not be cancelled. Consequently, K-F must pay the stipulated premium for coverage during the year in dispute, the third option year. The Court will, by separate

---

[1] Defendants include K-F Technologies, Inc., the Franz Johannes Fruehbis Management Trust, Petra Fruehbis, Edward Coburn, Paul E. Kneis, and Franz Johannes Fruehbis.

[2] Counsel for Defendants withdrew after the Court ruled on the summary judgment motions. The Clerk subsequently entered default against (i) K-F, K-F Technologies, Inc., the Franz Johannes Fruehbis Management because, under the Local Rules, corporate entities may not represent themselves, and (ii) Edward Coburn and Franz Johannes Fruehbis because they did not appear at trial to represent

1

order, award to plaintiffs the unpaid premiums plus pre-judgment interest. The Court will schedule further proceedings to determine (i) the attorneys' fees and costs to be awarded under the indemnity agreement, and (ii) whether Counts II through VII of the Second Amended Complaint, which were stayed, require further litigation.

**I.    Facts**

In October 2000, defendant K-F entered into a contract with DC-WASA, which is not a party, to provide sludge dewatering services (the "Contract"). The initial contract term was one year. DC-WASA, however, had the right to extend the Contract for four option years.[3] The Contract stipulated that K-F would be paid a set fee per dry ton of sludge processed. The total fee for each year would be calculated retroactively depending on the quantity of sludge actually processed. The Contract did, however, estimate the value of the contract for the base and each option year, as follows:

    Base Year (Oct. 21, 2000-Oct. 20, 2001)         $5,115,537.50
    Option Year One (Oct. 21, 2001-Oct. 20, 2002)   $4,984,837.50
    Option Year Two (Oct. 21, 2002-Oct. 20, 2003)   $5,058,162.50
    Option Year Three (Oct. 21, 2003-Oct. 20, 2004) $5,058,162.50
    Option Year Four (Oct. 21, 2004-Oct. 20, 2005)  $5,058,162.50

(Pl. Ex. 1 at 256).

The Contract, which was written by DC-WASA, required K-F to supply a surety bond for the Base Year "in an amount equal to 100 percent of [K-F's] proposed first year contract price." (Id. at

---

themselves. The Court has not yet entered a default judgment against these parties.
[3]    The term of the contract is defined as "one year from the award date . . ., subject to the Authority's option to extend the term of the contract in accordance with paragraphs B and C below." Paragraph B states that the "government may extend the term of this contract for up to four (4) one (1) year periods." (Pl. Ex. at 288).

0294). In the event that DC-WASA extended the term of the Contract, K-F was required to "submit performance security, in an amount such that the total security remains equal to 100 percent of the total price for any proposed option exercises." (Id.)

During the Base Year, K-F supplied a bond from American Safety Casualty Company ("American Safety"). Using a DC-WASA bond form, K-F and American Safety bound themselves, in the event of default, to pay a "penal sum" of up to $5,115,538.00. (Def. Ex. 4.) The obligors would be released from "the above obligation" only if K-F performed all requirements of the Contract "during the original term of the Contract and any extension thereof." The premium for the bond was one percent of the penal sum. (Id.)

At the end of the Base Year, DC-WASA exercised its option to extend the Contract through Option Year One. By this time, American Safety had lost its Treasury Listing and was no longer eligible to bond a government contract. DC-WASA would not permit K-F to perform work unless it secured a new bond.

Accordingly, K-F turned to the Ellsworth Corporation, a Louisiana-based bond brokerage firm. Ellsworth agreed to help K-F secure a bond from the Gulf Insurance Company ("Gulf").[4] Ellsworth imposed two conditions, however. First, the premium would be three percent of the penal sum.[5]

---

[4] Travelers Indemnity Company, the successor in interest to Gulf, is a plaintiff in this case.

[5] As a broker, Ellsworth would be responsible for billing K-F and collecting premiums. When K-F made a payment, Ellsworth would retain its share of the premium and send the rest to Gulf. If K-F failed to pay promptly, Ellsworth had two options. First, it could "turn the account over" to Gulf for collection. If Ellsworth chose this option, it would forfeit its share of the premium. Second, Ellsworth could continue to pursue payment from K-F. If Ellsworth chose this option and K-F still did not pay, Ellsworth would have to pay Gulf's share of the premium.

Second, Ellsworth insisted that K-F and all of its owners enter into an Indemnity Agreement whereby the owners, inter alia, obligated themselves to pay bond premiums and the cost of collection in the event of a K-F default.[6]

K-F and Gulf executed the bond ("the Bond") in January 2002. The Bond was identical to the American Safety bond, except for the following: (i) the contract date was October 21, 2001, which was the first day of Option Year One, (ii) the penal sum was $ 4,984,837.50, and (iii) the three percent premium was to be paid to Ellsworth. (Pl. Ex. 2.)

Option Year One passed without incident. K-F performed the work required under the Contract and remitted its premium payment to Ellsworth. At the close of Option Year One, DC-WASA exercised its option to extend the Contract through Option Year Two. K-F and Gulf did not sign a new bond. Gulf did, however, issue a "Continuation Certificate" on December 13, 2002. The Continuation Certificate stated, in pertinent part:

> To be attached to Bond described below, executed by Gulf Insurance Company, as Surety, K-F Environmental Ttechnologies [sic], Inc. as Principal, District of Columbia Water and Sewer Authority, as Obligee, on Bond No. B21850437 a performance bond. Said Principal and said Surety hereby agree that the term thereof and hereby is extended from the 21st day of October, 2002, to the 20th day of October, 2003, subject to all other provisions, conditions and limitations of said bond, upon the express condition that the Surety's liability thereunder during the original term of said bond and during any extended term thereof shall not be cumulative and shall in no event exceed the sum of $ 4,159,900.00.

PX 9.

Six days later, Ellsworth issued an invoice to K-F for $151,744, which is three percent of

---

[6] On January 22, 2002, the following people signed a pre-printed Gulf Indemnity Agreement: (i) Petra Fruehbis, individually and in her capacities as president of K-F, managing member of K-F Technologies, LLC, and trustee of the Franz Johannes Fruehbis Management Trust, (ii) Edward

4

$ 5,058,162.50, the estimated price for Option Year Two.  K-F remitted the premium amount on December 31, 2002.  Ultimately, the contract price for Option Year Two proved to be $ 4,733,478.38. (Def. Ex. 15), which was less than the estimate on which the premium was calculated.  Accordingly, Ellsworth sent K-F a partial refund.

At the close of Option Year Two, DC-WASA exercised its option to extend the Contract through Option Year Three.  Although the estimated price for Option Year Three was $5,058,162.50, K-F President Petra Fruehbis expected the actual figure to be lower.  She asked Ellsworth to delay issuing an invoice for Option Year Three until the contract amount was finalized.  Ellsworth consented.  It did not issue a Continuation Certificate, as it had in Option Year Two.

During Option Year Three, Lamar Plauche ("Plauche"), an Ellsworth employee, was in regular contact with Fruehbis.  Fruehbis gave Plauche occasional updates on the estimated contract price, but never delivered a final number.[7]  On October 28, 2004, after Option Year Three had expired, Ellsworth received a document from DC-WASA stating the final contract amount as $3,641,691.74.  The document also announced that DC-WASA had extended the Contract through Option Year Four.  (Pl. Ex.20.)

Ellsworth generated a bill on October 29, 2004 for $109,251, representing three percent of the final contract price for Option Year Three. (Pl. Ex. 21.)  K-F refused to pay, asserting that it wanted proof that coverage had been in effect during the option year.  After months of wrangling, Gulf sent

---

Coburn, (iii) Paul Kneis, and (iv) Franz Johannes Fruehbis.

[7]   Fruehbis testified that Plauche informed her during Option Year Three that the bond was not in effect.  Plauche denies this.

Ellsworth a Continuation Certificate for Option Year Three on February 9, 2005. On February 13, 2005, K-F sent Ellsworth a check, but in the amount of only $25,000. Upon receipt of what it considered to be a partial payment, Ellsworth sent K-F a copy of the Continuation Certificate for Option Year Three, but stamped it as "void."[8] (Pl. Ex 34).

On May 3, 2006, Ellsworth issued an invoice for Option Year Four in the amount of $50,433. Despite Fruehbis's repeated promises to pay the outstanding balance, K-F never did.

Ellsworth and Travelers Indemnity Company, the successor to Gulf, filed the instant suit on January 17, 2006. Count I of the Second Amended Complaint proceeded to discovery and trial. Counts II through VII were stayed pending resolution of Count One.[9]

Count I alleges that K-F breached the terms of the Bond by failing to remit premiums due for Option Years Three and Four. It also alleges that the indemnitors breached the terms of the Indemnity Agreement by failing to cure K-F's payment default. Plaintiffs seek $134,684 in premiums from all defendants. This includes (i) the $109,251 premium for Option Year Three, minus the $25,000 payment K-F made on February 15, 2005, and (ii) the $50,433 premium for Option Year Four. Plaintiffs also seek attorney's fees, costs, and pre-judgment interest. Defendants contend that (i) no coverage was in effect for Option Year Three and thus no premium is owing, and (ii) the $25,000 payment covered the premium for Option Year Four, which was $20,311.

## II.     Choice of Law

---

[8]     Alex Ellsworth testified that he did this because he did not want K-F using the Continuation Certificate without paying the Option Year Three premium. (Pl. Ex 34).

[9]     Counts II through VII are fraud, negligent misrepresentation, and intentional misrepresentation claims against Fruehbis and Paul Kneis.

As an initial matter, the Court must determine which state's law governs the interpretation of the contract at issue. Plaintiffs argue for Louisiana; Defendants argue for Maryland. In deciding this issue, the Court must apply Maryland's choice of law rules. See Harte-Hanks Direct Marketing/Baltimore, Inc. v. Varilease Technology Finance Group, Inc., 299 F.Supp.2d 505, 517 (D. Md. 2004) ("The forum state's conflict of law rules determine what substantive law to apply to state law claims in federal court."). "Maryland applies the law of the jurisdiction where the contract was made to matters regarding the validity and interpretation of contract provisions, and a contract is made where the last act necessary to make the contract binding occurs." Riesett v. W.B. Doner & Co., 293 F.3d 164, 173 n.5 (4th Cir. 2002) (citations omitted). Plaintiff argue that the "last act" occurred in Louisiana, while defendants contend it occurred in Maryland or the District of Columbia.

The facts are as follows. In January 2002, Kneis, who is the vice president and secretary of K-F, traveled to Louisiana to pick up the Bond. While Kneis was in Louisiana, Ellsworth faxed the bond form to Fruehbis in Maryland. She signed it and faxed it back to Louisiana. There, Kneis attested to Fruebhis's signature, and Plauche signed the form as attorney-in-fact for Gulf. K-F later forwarded the bond form to DC-WASA, but DC-WASA rejected it because Fruehbis's signature was a photocopy and not an original.

To solve the problem, Plauche executed a new bond form in Louisiana and mailed it to Fruehbis in Maryland. There, Fruehbis signed the form and Kneis attested to her signature. Fruehbis then mailed the original form to DC-WASA. Because no representative of DC-WASA testified at trial, the

7

Court is unable to determine (i) whether and where the contracting officer signed the bond, and (ii) whether the contracting officer's signature was required for the bond to become effective.[10]

In spite of these unanswered questions, it is clear that the last act necessary to finalize the bond happened either in Maryland or the District of Columbia and not Louisiana.  The Court need not choose between Maryland and the District of Columbia, because their rules of contract interpretation are the same with respect to the issues presented by this case.

## II.	Standard

In Maryland and the District of Columbia, contracts are to be construed as a whole to effectuate the parties' intentions. See Sullins v. Allstate Ins. Co., 667 A.2d 617, 619 (Md. 1995); Dodek v. CF 16 Corp., 537 A.2d 1086, 1093 (D.C. 1988).  The terms of the contract are to be given the meaning that a reasonably prudent person would attach to them.  Sullins, 667 A.2d at 619.  If the language of the contract is "plain and unambiguous," then the Court's inquiry ends.  United Services Auto. Ass'n v. Riley, 899 A.2d 819, 833 (Md. 2006); see also Dodek, 537 A.2d at 1093.  If, however, the contract is reasonably susceptible to more than one meaning, then the Court consults extrinsic evidence to resolve the ambiguity.  See United Services Auto. Ass'n, 899 A.2d at 833; Rivers & Bryan, Inc. v. HBE Corp., 628 A.2d 631, 635 (D.C. 1993).

## IV.	Analysis

### A.	Did K-F Breach the Terms of the Bond by Failing to Pay the Option Year Three Premium?

---

[10]   The bond form at issue in this case requires the signatures of authorized representatives of the principal and the surety.  It also includes a line for the signature of a contracting officer at DC-WASA.  The words "Approved by:" precede this signature line.

The first substantive dispute concerns whether the Bond was in effect during Option Year Three. Briefly, the parties' arguments are as follows. Plaintiffs contend that under the terms of the Bond, Gulf had no choice but to provide coverage during any and all options years exercised by DC-WASA. The coverage amount was automatically tied to the Contract price. Accordingly, Gulf bonded K-F's performance in Option Year Three in the amount of the final contract price for that year, which was $3,641,691.74. K-F failed to pay all but $25,000 of the $109,251 premium.

K-F's position is that the Bond was written to cover Option Year One. The remaining option years would be bonded only if (i) DC-WASA exercised its option for that year, (ii) K-F requested Gulf to cover the option year, and (iii) Gulf agreed to do so by issuing a Continuation Certificate extending the Bond through the option year. Gulf did not issue a Continuation Certificate for Option Year Three until well after the year was over, and the copy that K-F received was stamped "void." Accordingly, K-F argues, no bond was in place during that year, and it owes no premium.

    **1.    The Language of the Bond and the Contract**

        **(a)    Plaintiffs' Interpretation**

Plaintiff's textual analysis begins with the third paragraph of the Bond. The text states that Gulf will be released from its "obligation" under the Bond only if K-F performed the "agreements of the Contract during <u>the original term of the Contract and any extension thereof</u> that might be granted by the District with or without notice to the Surety." (Pl. Ex. 2) (emphasis added). Plaintiffs read this language to mean that Gulf's obligation automatically extended to an option year, which is a contract extension, as soon as the option was exercised by DC-WASA. They interpret the phrase "with or without notice to

9

the Surety " to intend that no act on Gulf's part was required to extend coverage to the option year. Plaintiffs also argue that the penal sum of the bond automatically varied with changes in the contract price. In support of this claim, Plaintiffs point out that the Bond covered "any duly authorized modifications of the Contract that may hereafter be made." (Pl. Ex. 2.)

Defendants contend that the phrase "the original term of the Contract and any extension thereof" refers to any extensions of Option Year One, not exercises of Option Years Two, Three, or Four. They assert, for example, that if K-F had experienced an equipment breakdown in Option Year One that prevented it from meeting its obligations for that year, DC-WASA could have chosen to "extend option year one to allow K-F to make up the production deficit." Reply at 9. Thus, Defendants argue, Gulf was bound if Option Year One was extended beyond October 20, 2002. The Bond did not automatically bind Gulf to cover Option Years Two, Three, and Four, they maintain.

As further support for this argument, Defendants note that the penal sum listed on the Bond is fixed as $4,984,837.50, which is the stated contract price for Option Year One. The Contract contemplated that the contract price for the option years would vary with the amount of work done by K-F. Hence, Defendants argue that the inclusion of a specific penal sum in the Bond clearly limits Gulf's liability to one year only.

Finally, Defendants point to the Contract language requiring K-F to submit "performance security, in an amount such that the total security remains equal to 100 percent of the total price for any proposed option exercises." This, they explain, is evidence that K-F was required to purchase a new bond each year in the contract amount for that year.

The Court agrees with Plaintiffs that the Bond covered the option years. The Contract provided

10

for a base year and, at DC-WASA's option, a series of one-year extensions. Accordingly, a reasonably prudent person would read "the original term of the Contract and any extension thereof" to include the option years, as they were exercised by DC-WASA. Under this reading, the Bond was continuously in effect through Option Year Four.

Defendants interpretation of the Bond and the Contract is strained. If, for example, the phrase "the original term of the Contract and any extension thereof" actually meant "extensions of Option Year One, but not exercises of Option Years Two through Four," then DC-WASA could extend Option Year One and at the same time exercise its option to extend the Contract through Option Year Two. Option Year One and Option Year Two could run concurrently. Defendants have provided no evidence that the parties intended this result.

Moreover, the requirement that K-F supply security in an amount equal to 100 percent of any option exercises cannot fairly be read to require an entirely new bond each year. A much more natural reading of this language is that K-F was required to ensure that the amount of the coverage remained equal to the contract price for any option exercises. If, for example, the proposed contract price for Option Year Two were $6 million, then the penal sum listed in the Bond would no longer be adequate. K-F would be required to show that it was covered in the full amount.

The case Defendants cite in support of the proposition that the inclusion of a penal sum limits the duration of the bond is easily distinguished. In <u>Modern Electric v. Ideal Electronic Sec. Co., Inc.</u>, 868 F.Supp. 10 (D.D.C. 1994), the court concluded that the bond at issue contemplated surety coverage

11

for one year only.[11] Significantly, the contract in Modern Electric specifically provided that "[t]he performance and payments bonds will be separate for the base year and each option year." Accordingly, Modern Electric is inapplicable.

As discussed, the Plaintiffs are correct as to the duration of the Bond. The Court finds no textual support, however, for Plaintiffs' contention that the amount of Gulf's obligation automatically varied from year to year depending on the Contract price. First, the Bond explicitly states that Gulf's obligation was in the amount of "the above penal sum." The penal sum listed in the Bond is $ 4,984,837.50. The Bond instrument does not include a mechanism for varying the penal sum based on modifications to the Contract.[12]

In sum, the Plaintiffs' interpretation of the Bond as covering Option Year One through Option Year Four is correct. Their claim that the penal sum varied automatically based on the contract price is not. The Court concludes that the Bond covered the entire term of the contract and, therefore, was in effect during Option Year Three. The amount of the bond was limited to $4,984,837.50. If the parties wished to increase the penal sum, they were required to modify the terms of their agreement. Absent such a modification, the penal sum remained $4,984,837.50.

## 2. Extrinsic Evidence

Because the language of the Contract and the Bond are clear, extrinsic evidence is unnecessary.

---

[11] The underlying contract between the United States Army and the contractor called for a base year and an option to extend the contract for two more years.

[12] Additionally, the Contract states that "[t]hirty (30) days prior to the expiration of the contract or any extensions thereof, the Contractor shall submit performance security, in an amount such that the total security remains equal to 100 percent of the total price for any proposed option exercises." (Pl. Ex. 1 at 0294.) This language would be unnecessary if the penal sum automatically adjusted to

The Court will discuss it nonetheless.

While the trial evidence was inconsistent, most of it reinforces the plaintiffs' claim that the Bond could not be cancelled during the life of the Contract. As the industry witnesses testified, the purpose of a performance bond is to guarantee that the contractor will perform. When a multi-year contract is involved, all years must be covered to protect the party relying on the contractor. Most of the witnesses testified that it is customary for the bonding company to obligate itself, up front, to cover the entire contract. The bonding company must protect itself by accurately assessing the contractor's ability to pay and by requiring the type of indemnity agreement that Gulf extracted from K-F and its owners. If premiums are due annually, the insurance company bears the risk of non-payment, and it cannot cancel for non-payment.

Witness after witness testified persuasively that the Bond in this case followed industry practice.[13] This testimony is consistent with the actions of the parties during the first three option years. Although no representative of DC-WASA testified at trial, it acted as if the Bond would remain in effect for the duration of the Contract, whether a Continuation Certificate issued or not.

Fruehbis herself acted as though K-F was bonded during Option Year Three. She precipitated the delay in the issuance of the Continuation Certificate by asking Ellsworth to refrain from billing K-F

---

accommodate the contract price for option year exercises.

[13]   These witnesses included: (i) Alex Ellsworth, the president of the Ellsworth Corporation, (ii) Plauche, (iii) Mark Fitzgerald, who headed Gulf's run-off division, (iv) John Cocomazzi, a former vice president at Gulf, (v) Jerry Underwood, a former surety underwriting manager at Gulf, and (vi) Robert Wheeler, who was qualified as an expert in the surety business. All of these witnesses, with the exception of Wheeler, played a role in securing and/or administering the bond, and only Alex Ellsworth and Plauche have any current affiliation with either Ellsworth or Gulf. Ellsworth was qualified as an expert in the reasonableness of performance bond rates.

until the contract price was finalized. She continually gave Ellsworth updates on the Contract price. Neither she nor anyone else at K-F sought a bond from another surety company during that year. Only after the end of the option year, when Ellsworth insisted on payment, did she begin to express doubts about the bond coverage. Even then, she repeatedly promised to pay premiums in the amount of three percent of the final contract price for Option Year Three.

Finally, representatives of Ellsworth and Gulf testified that the Bond was in effect in Option Year Three. On cross-examination, K-F undercut their testimony by pointing to statements and actions suggesting that there was no coverage. While these inconsistencies complicate the record, Plaintiffs successfully explain them.

For example, on December 5, 2002, surety underwriting manager Jerry Underwood wrote a letter to John Cocomazzi, a Gulf vice president, "recommend[ing]" renewal of the Bond for Option Year Two "at the contract price of $5,058,162." (Pl. Ex. 64.) The letter appears to contradict Plaintiffs' argument that the Bond renewed automatically. At trial, however, both Underwood and Cocomazzi testified that the letter concerned the contract price and the premium only. Both understood that the Bond would cover the option years. Underwood, however, did not have the authority to approve the new Bond amount. Accordingly, he wrote to Cocomazzi, his superior, for approval. The Court is satisfied with this explanation.

On November 10, 2004, Alex Ellsworth wrote a letter telling DC-WASA that the Bond had expired at the end of Option Year Three. At trial, he testified that he knew his statement to be untrue, but he made it in the hope that DC-WASA would pressure K-F to pay the outstanding premium. When DC-WASA called his bluff and began questioning whether the bond was in place, he did his best

14

to set the record straight.  On February 4, 2005, he wrote DC-WASA a long e-mail explaining that "the Performance Bond follows the contract[,] including any option year extensions accepted by the DC Water District." (Pl. Ex. 27.)  He observed, "[a] Continuation Certificate is merely for billing purposes and has nothing to do with the original bond and contract."  Id.  Finally, he assured DC-WASA that "Gulf Insurance Company has already stated that their Legal Department feels that they could not get off of this bond even if they wanted to do so."  Id.  Moreover, under the arrangement between Gulf and Ellsworth, the broker was responsible for guaranteeing payment of Gulf's portion of the premium.  At trial, Ellsworth established that it satisfied this obligation by paying Gulf for Option Year Three.  This is highly persuasive evidence that both Gulf and Ellsworth understood that the Bond covered Option Year Three, regardless of K-F's payment of the premium.

Despite this understanding, Gulf representatives persisted in suggesting that the Bond was not in effect.  Gulf employee Mark Fitzgerald was responsible for winding up the files that remained active after Gulf discontinued its practice of writing performance bonds.  On February 4, 2005, Kneis wrote to Fitzgerald asking whether the Bond had been in effect during Option Year Three.  Fitzgerald responded that the Bond had expired.[14]

At trial, Fitzgerald, who is no longer employed by Gulf or Travelers, testified that he based his statement on a cursory investigation of an internal Gulf database.  He did not consult the Bond or the Contract.  He did not check with Ellsworth.  Later, Fitzgerald reviewed the Bond and the Contract and concluded that Gulf had no choice but to cover Option Years Three and Four, whether or not K-F paid

---

[14]   This occurred the same day that Mr. Ellsworth told DC-WASA the Bond was in effect.

15

the premiums.[15] Despite this conclusion, he attempted to coerce K-F into remitting the overdue premium by withholding the Continuation Certificate for Option Year Three unless K-F paid up and submitted a financial statement so that Gulf could evaluate its willingness to issue a Certificate for Option Year Four. (Def. Ex. 25).[16]

In doing so, Fitzgerald was attempting to apply pressure on K-F by creating the misimpression that the Continuation Certificate was necessary to bind coverage. While his motives are understandable, his actions are problematic. An insurance company is obligated to provide correct information to an insured, even one that is behind on its account. Nevertheless, the Court is satisfied, having heard all the testimony, that coverage was in place during Option Year Three.

The total premium payment due for Option Year Three was $109,251. K-F paid $25,000 toward that amount on February 15, 2005.[17] Accordingly, K-F owes Ellsworth and Gulf $84,251 for Option Year Three.

### B.   Did K-F Breach the Terms of the Bond by Failing to Pay the Option Year Four Premium in Full?

The following facts are undisputed: (i) the Bond was in effect in Option Year Four, (ii) on March 30, 2005, Gulf issued a Continuation Certificate that stated that Gulf's liability for Option Year Four was $1,681,098.75, (iii) the premium on the Bond was three percent of the penal sum, and

---

[15]   No one from Gulf contacted K-F to explain that Fitzgerald's February 4, 2005 email to Kneis had been in error.

[16]   He also noted that DC "did accept a continuation certificate that unambiguously ended our liability under the contract at 10/21/03." (Def. Ex. 25).

[17]   K-F now claims that this payment was for Option Year Four. As of the date of payment, Ellsworth had not even issued an invoice for Year Four. Accordingly, the Court rejects K-F's

16

(iv) Ellsworth billed K-F for $50,432.96, which is three percent of $1,681,098.75. Defendants claim that the correct premium was $20,311, which was Gulf's portion of the premium for Option Year Four. The Court disagrees. Under the terms of the Bond, K-F agreed to pay a premium of three percent of the penal sum. Accordingly, the premium due for Option Year Four was $50,432.96.

### C. Did the Indemnitors Breach the Terms of the Indemnity Agreement by Failing to Pay the Premiums in K-F's Stead?

Even though K-F is responsible for the full amount of the unpaid premiums, there remains the question of the indemnitors' liability under the Indemnity Agreement.[18] The indemnitors agreed to pay to Gulf:

> premiums and charges at the rates, and at the times specified in respect to each such bond in [Gulf's] schedule of rates, which, with any additions, or amendments thereto, is by reference made a party hereof, and will continue to pay the same where such premium or charge is annual, until the company shall be discharged and released from any and all liability and responsibility upon and from each such bond or matters arising therefrom.

---

contention.

[18] As discussed, the following people signed the Indemnity Agreement: (i) Fruehbis, in her individual capacity and as president of K-F, managing member of K-F Technologies, LLC, and trustee of the Franz Johannes Fruehbis Management Trust, (ii) Coburn, (iii) Kneis, and (iv) Franz Johannes Fruehbis.

The signature line for Mr. Fruehbis contains an illegible signature, followed by A(PF).@ It is unclear whether Mr. Fruehbis signed the agreement himself or whether someone else signed it for him. Moreover, Mr. Fruehbis's signature was not acknowledged, as was required under the terms of the agreement. The Clerk has entered default against Mr. Fruehbis, who did not appear at trial. Accordingly, he has waived any argument that he is not bound by the Indemnity Agreement.

The Indemnity Agreement also does not include an acknowledgement of Kneis's signature. He has not argued that he is not bound by the agreement, however. Accordingly, this argument is waived.

17

(Pl. Ex. 3.) The indemnitors note that the three percent premium listed on the Bond included a commission for Ellsworth. They claim that they are only responsible for paying the portion owing to Gulf.

The Court disagrees. The Indemnity Agreement refers to Gulf's schedule of rates. The only rate listed anywhere in the Bond is the three percent premium. Accordingly, should K-F fail to pay the $134,684 in premiums it owes to Gulf and Ellsworth, Gulf may collect that amount from the indemnitors.

### D.     Attorney's Fees

Plaintiffs have asked the Court to award them reasonable attorney's fees. The Indemnity Agreement states that the "[i]ndemnitors will indemnify and save [Gulf] harmless from and against every claim, demand, liability, cost, charge, suit, judgment and expense which [Gulf] may pay or incur in consequence of having executed, or procured the execution of, such bonds . . ., including fees of attorneys, whether on salary, retainer or otherwise." (Pl. Ex. 3.)

The Court will grant the reasonable attorneys fees and costs.[19] By separate order, the Court will schedule a hearing for determining the amount of fees and costs to be awarded. In that regard, the Court intends to take into consideration the fact that the confusion created by Gulf representatives as to the duration of the Bond unnecessarily complicated the record. Pursuant to the schedule set forth in the accompanying order, plaintiffs will submit an accounting with the amount of fees and costs claimed,

---

[19]    Under Maryland law, a trial court does not have the discretion to decline to award attorney fees when the parties have contracted for such an award. Myers v. Kayhoe, 892 A.2d 520 (Md. 2006).

18

which shall include attorney time records. Defendants will have the opportunity to oppose plaintiffs' claim for reasonable fees and costs.

**V.     Conclusion**

    For the reasons stated herein, the Court will, by separate Order:

(i)      ENTER JUDGMENT against K-F Environmental Technologies, K-F Technologies, Inc., the Franz Johannes Fruehbis Management Trust, Edward Coburn, Franz Johannes Fruehbis, Petra Fruehbis, and Paul Kneis on Count One of the Second Amended Complaint in the amount of $134,684 plus prejudgment interest. The defendants shall be jointly and severally liable for this amount. The judgment against all defendants but Petra Fruehbis and Paul Kneis shall be by default.

(ii)      DIRECT plaintiffs to file a status report in 14 days stating whether they wish to proceed with Counts II through VII.

(iii)      GRANT plaintiffs' request for reasonable attorneys' fees. Plaintiffs shall SUBMIT an accounting stating the amount of fees and costs claimed. This accounting should include records supporting the amount claimed and should be filed in conjunction with plaintiffs' status report.

(iv)      DIRECT the Clerk to MAIL copies of this Memorandum to all defendants.

Dated this 7th day of September, 2007.

                                                                                /s/
                                                      Benson Everett Legg
                                                      Chief Judge